UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                                    :
CONGREGATION SHEARITH ISRAEL,                       :
                                                    :
                                Plaintiff,          :      12 Civ. 8406 (MGC)
                                                    :
        - against -                                 :
                                                    :
CONGREGATION JESHUAT ISRAEL,                         :
                                                    :
                                Defendant.          :
                                                    :
———————————————————————— x

## DECLARATION OF RABBI MARC D. ANGEL

Rabbi Marc D. Angel declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am Rabbi Emeritus of Plaintiff Congregation Shearith Israel, the Spanish & Portuguese Synagogue of New York (hereinafter "Plaintiff" or "Shearith Israel").  I make this Declaration to support Shearith Israel's opposition to the motion to dismiss or in the alternative to transfer this action, made by Defendant Congregation Jeshuat Israel (hereinafter "Defendant", "Jeshuat Israel", or "CJI").  I make this Declaration on the basis of personal knowledge or on my information and belief based on my over 40 years personal experience and on my review of pertinent documents and historical archives of Shearith Israel.  I have neither intention nor authority to waive any privileges or immunities or defenses of Shearith Israel, and I could testify to the following.

2.      I have been affiliated with Shearith Israel since 1969.  I was the Rabbi (which our Congregation technically calls *Hazzan*) beginning in 1977 and was Senior Rabbi of Shearith Israel for over 23 years.  I am now Rabbi Emeritus.  I remain active in the religious life of Shearith Israel, including by responding to the needs of the Synagogue, from time to time

delivering sermons on the Sabbath, and participating in life-cycle events of our congregants, including weddings and funerals. A description of the over 350-year history of Shearith Israel is given in a book I wrote about Shearith Israel titled *Remnant of Israel*. I have studied our Congregation's history and the history of Jews in America for many decades. (Documents herein referred to as Ex. __ are Exhibits in the accompanying compendium of exhibits.)

3.       Shearith Israel is a Jewish Congregation in New York. It is North America's first Jewish Congregation and has been home to Jews since after the first arrival of Jews in North America in 1654. Part of the mission of Shearith Israel has been to act as a haven for Jews as well as actively to participate in, promote, and celebrate the American Jewish experience. Our congregants were the Jews first to seek citizenship in pre-United States New Amsterdam (which was turned down by Peter Stuyvesant and then permitted by the ruling authority overseas); have included Jews who fought in the Revolutionary War and in each other war of the United States since the founding of the Republic; Rabbis who have been among the leaders of American Jewry; and great American Jews such as Emma Lazarus and Justice Benjamin Cardozo.

4.       Since its inception and continuing until today, Shearith Israel has followed the Orthodox Jewish ritual of the Spanish and Portuguese Jews, sometimes known as the Western Sephardic Tradition. Shearith Israel is now the main keeper of that Tradition in the world, with Congregations in Philadelphia, London, Amsterdam, and very few other places following that Tradition. It is the same Tradition that Defendant CJI has committed to follow in its organizing Constitution and By-laws.

5.       There are more Jews in New York than in any other American city (indeed, more than anywhere else in the world outside Israel). More specifically, there are more

Sephardic Jews in New York than anywhere else in America (again, more than anywhere else in the world outside Israel).

6.     Shearith Israel owns various religious and ritual objects.  These include land, building, cemeteries (both active and historic), and religious objects used by its Synagogue located at 2 West 70th Street in New York City.  These also include land, building, and religious objects currently used by CJI at the Touro Synagogue located in Newport, Rhode Island.  Until this recent dispute there was no intractable disagreement between the Congregations that Shearith Israel owned the land, building, and religious objects currently used by CJI at the Touro Synagogue.

7.     I am familiar with the finial bells, or rimonim, at issue in this action (the Rimonim).  Rimonim adorn the Torah Scrolls used during Jewish religious services.  Based on my knowledge and information, the Rimonim at issue were crafted in the 18th Century by the well-known silversmith Myer Myers in New York.  Rimonim are an important part of the ritual, rites, and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Shearith Israel.  They are considered one of the sacred objects used as part of the Torah service.

8.     There are several threshold reasons why CJI has no right to sell the Rimonim.  Those reasons help explain a) why the witnesses and documents pertinent to CJI's surprising claim that it owns the Rimonim and has the right to sell them are centered in New York, not Rhode Island, and b) far more important in my opinion, why the resolution of this dispute is of overwhelming significance to Jews in New York and not Rhode Island.

9.     CJI does not own the Rimonim and thus has no right to sell them.  For 190+ years Shearith Israel has owned the Touro Synagogue, including its land, building, and religious objects.  As CJI's own website explains, during the 1820s, when the Jewish community of Newport vanished, "Legal oversight of the [Touro synagogue] building, its contents, and its

-3-

deed was handed to Congregation Shearith Israel in New York" (Ex. 12). This came about as follows: By 1822, Yeshuat Israel, original possessor of the Rimonim, ceased to exist. After 1822, the Synagogue, cemetery, and ritual items of Yeshuat Israel were left in the care of Stephen Gould, who took care of the property for several years. Thereafter ownership of the Synagogue and real and personal property including the Rimonim were conveyed to Shearith Israel. For example, in 1826, Moses Lopez, then residing in New York, wrote to Stephen Gould that the "building is now considered owned at present by the Hebrew Society of this city" [i.e., Congregation Shearith Israel] and that he was "determined to send for the keys and place them in [the trustees] hands that they may do what they please with them."

10.    Shearith Israel's fundamental legal oversight has never changed since the mid-Nineteenth Century. Our rights flowed from (among other places) the original Congregation Yeshuat Israel, which was the original Jewish congregation in Newport.

11.    It is important to understand that Yeshuat Israel is not related to the much more recent CJI, the Defendant in this action. As the Rabbi of the Touro Synagogue for 35 years said in the middle of the Twentieth Century (see Ex. 2 at 282), before CJI ever came into existence, Shearith Israel had (among other things) participated in the funding of the construction of the Touro Synagogue; Shearith Israel has also acquired ownership (including the keys) to the Synagogue and its contents; had been deeded the land (e.g., Ex. 4), in deeds that expressly conveyed not just the real property but the "appurtenances" as well as "all the estate, and the rights of the" grantor in the premises and with the proviso that Religious Services at the Touro Synagogue be done "according to the Ritual, Rites and Customs of the ORTHODOX SPANISH AND PORTUGUESE JEWS, as at this time practiced and observed in the Synagogue of the CONGREGATION SHEARITH ISRAEL in the City of New York); had kept up basic

USActive 27095359.3

maintenance the Synagogue and Newport Jewish Cemetery in Newport; and had found or approved of a Rabbi to lead a reawakening of Jewish life in Newport.

12.     CJI never owned the land, building, or ritual objects of the historic Touro Synagogue. CJI's own website records that in 1881 a new community in Newport "petitioned Congregation Shearith Israel to reopen the town's synagogue for services and to appoint a permanent rabbi" (Ex. 12). We did so. In 1881, for example, Shearith Israel brought the Torah (the holy scripture on which bells would have been placed) and other necessary ritual objects from New York to Newport and then brought them back to New York until the Newport community was large and stable enough to be able to use them with more regularity. See de Sola Pool (Ex. 3 at 5-6). Whether in New York or in Newport, the scroll and ritual objects were used under the oversight of a Shearith Israel-appointed Rabbi.

13.     To make the point more poignantly, although CJI claims that the Rimonim were returned to Newport and have been there ever since, the fact is that the Rimonim "returned" to Newport were *not* the same pair as Shearith Israel acquired from Newport in the 1820s. That is, when Shearith Israel sent the Torah scrolls and bells for the new Newport Congregation's use at the end of the Nineteenth Century, Shearith Israel sent one of the "original" Newport bells and a second that Shearith Israel had, with the other "original" Newport bell remaining in New York, where it has remained until today. This "Newport" bell is available for use in our religious services in New York or for short-term loan to institutions. These facts not only show the dominion and control that Shearith Israel has and continues to exercise over the Rimonim; it also corrects any suggestion by CJI that it has had possession of the Rimonim since the Eighteenth or Nineteenth Centuries.

14.     In the late 1800s and early 1900s, a dispute arose between factions of the Jewish community in Newport. Neither faction represented Yeshuat Israel – the successor in

interest to Yeshuat Israel was and is the New York congregation, Shearith Israel.  To resolve the

in-fighting, Shearith Israel stepped in as owner.  The matter was resolved after a judicial decision

brought by CJI against Shearith Israel ended with a decision ruling against CJI, the court stating

that "it is difficult to imagine how the "Congregation Jeshuat Israel, a corporation created by law

[in the late Nineteenth Century], can be regarded as having any right or interest in such a trust"

(i.e., the trust that conveyed the building, premises, and fixtures to Shearith Israel) (Ex. 10).  In

settlement of the lawsuit CJI "agrees to admit and recognize without qualification the title and

ownership of [the Shearith Israel Trustees] to the synagogue building, premises and fixtures" and

that the Shearith Israel Trustees, "upon receiving the absolute surrender of said premises", would

enter into a lease for five years "in form satisfactory to the landlord" (Ex. 7).

15.    This conclusion was reaffirmed by the CJI Board itself.  Ex. 8 are minutes

of a special meeting of the CJI Board held February 2, 1903 at which the Board unanimously

passed a resolution that the disputes between CJI and Shearith Israel Trustees "have been

amicably settled" and further

> Resolved, That the [CJI Board Delegates] of this congregation be and they hereby
> are authorized and directed to surrender the possession of the Synagogue
> **building, premises and paraphernalia** belonging thereto at Newport, to the said
> Trustees, owners of the property, and to agree upon the terms and provisions of a
> lease from said Trustees to this Congregation for the term of five years from
> February 1, 1903, at the nominal rent of one dollar yearly, in form satisfactory to
> the landlord.

16.    The leases, which together with other stipulations became Indentures,

were executed in 1903 and again in 1908 (Exs. 5, 6).  Since 1903 and 1908, CJI, the new

congregation in Rhode Island, which is not the successor to Yeshuat Israel and which never

owned any of the land, building, or contents, has been operating pursuant to an Indenture granted

USActive 27095359.3

from Shearith Israel. As the document reflects, the Indenture with lease that remains in effect was signed last, by Shearith Israel in New York.

17.   The Indentures between Shearith Israel and CJI contain explicit reference to Shearith Israel's ownership of, and, as lessee, CJI's right to use, "appurtenances" and/or "paraphernalia" – terms that the contemporaneous documents prove included the Rimonim. (For example, Shearith Israel appointed Rev. Abraham Pereira Mendes of London to minister to the Touro Synagogue Congregation from 1883 until his death in 1893. After his death, Shearith Israel Rabbi Henry Mendes appointed Rev. David Baruch to be the *Hazzan*. A letter of June 13, 1893 from Shearith Israel's Rabbi in New York confirmed that Shearith Israel owned and controlled the real and personal property of Touro Synagogue, that the bells, including the Rimonim, were part of the ritual of the service, and that "appurtenances" included the Rimonim:

> You are hereby empowered to use the Sepharim, Bells [i.e., rimonim], Books, Shofar and all ***other* appurtenances** for worship now in Newport Synagogue or in storage at the Newport Bank (Bank of Rohde Island) and the Synagogue building and adjoining buildings as minister to the officiate in said synagogue subject to the condition sent to the [Mayor] 5th June. Upon termination of your appointment, you will return said to our agent or legal representative the custody of the buildings and appurtenances. (Ex. 13 (emphasis supplied).)

18.   A very specific episode that occurred in connection with the negotiation of the 1903 Indenture reveals that both Shearith Israel and the new CJI understood that the latter had the right to use, but did not own, the objects within the Synagogue, which at the time included the Rimonim. Specifically, a letter from New York dated February 10, 1903 from L. Napoleon Levy, the Parnas (or President) of Shearith Israel, stated:

> I notice an omission in the lease; we neglected to include the **paraphernalia**. If you can arrange to insert, "with the paraphernalia belonging thereto"…please do so. (Ex. 14 (emphasis supplied).)

-7-

19.     Further confirming the above, a letter dated February 18, 1903, written to

Parnas Levy states:

> Rev. Dr. Mendez called this morning and at 10.30 A.M. we meet at the
> Synagogue the Committee appointed by the Congregation Jeshuat Israel.  The
> amendment to the lease **"with the paraphernalia belonging thereto"** was
> interlined and the Committee then acknowledge the lease before me, as notary.
> The keys of the Synagogue, **ark &c**, were delivered by the Vice President of the
> Congregation to Dr. Mendez as representing the New York trustees.  The
> committee stated that they had full authority from the trustees of the congregation
> to deliver possession and execute lease.  Dr. Mendez subsequently delivered with
> the lease the keys to the Committee and then **Dr. Mendez went over the
> personal property with the Committee,** while I placed the lease on record. (Ex.
> 15 (emphasis supplied).)

20.     These letters' clear references to personal property, including by reference

to **"ark &c"**, as well as their reference to **"paraphernalia"**, are clearly references to the contents

of the Synagogue building, including the Rimonim.

21.     I have read a suggestion that the Indenture of 1908 is somehow not the

operative document between Shearith Israel and CJI.  No reason is given for that incorrect

assertion.  The Indenture calls for the payment of $1.00 annually, payment to be made by CJI to

Shearith Israel (which exists only in New York).  CJI's own website admits that: "A lease

amount of $1 per year is still paid by the current Newport congregation to Congregation Shearith

Israel for use of the building and grounds, which are still owned by the New York group" (Ex.

12).

22.     I am aware of other correspondence between the congregations confirming

that the 1908 Indenture remains in force.  For example, Ex. 16 is a 1959 letter from Shearith

Israel's Victor Terry in New York to Samuel Swerdloff of the Touro Synagogue Restoration

Committee in New York.  The letter encloses the 1908 Indenture with the explanation, "[t]his is

the lease under which we are still operating". The letter shows that the two people met in New York to discuss the restoration of the Touro Synagogue.

**Shearith Israel Has Supervised CJI from New York for More than 100 Years**

      23.    Shearith Israel has demonstrated its ownership of the land, building, and religious objects of Touro Synagogue in many other ways in addition to the clear title, the Indenture, the annual payments, and the admissions from CJI itself. For example, in a Jewish Congregation, there is no more significant figure than the spiritual leader, whether called Rabbi or *Hazzan*. The Rabbi or *Hazzan* would have ultimate responsibility from a religious point of view for determining what use or disposition could be made of the religious objects used by the Congregation. During at least the past 120 years, Shearith Israel has had the right and responsibility to approve the spiritual leaders (whether called Rabbis or *Hazzan*) of Touro Synagogue. The Indentures of 1903 and 1908 make that very clear, stating:

> It is further agreed that before any minister can officiate in said [Touro] synagogue, his appointment to the position must first be approved of in writing by a majority of the parties of the first part, or their successors [i.e., Shearith Israel].

      24.    I am personally aware of Shearith Israel's approval from New York of CJI Rabbis Chaim Shapiro and Mordecai Eskovitz.

      25.    I have also personally talked from New York with various CJI Rabbis over the years to discuss religious issues among other things.

      26.    The archival records of Shearith Israel in New York contain additional indications of CJI requests into New York for Rabbinic approval by Shearith Israel and of Shearith Israel approval of Rabbinical requests from New York (Exs. 1, 23, 24). So for example, Shearith Israel's archives in New York contain a 1903 letter from then Parnas (or President) of

Shearith Israel to CJI "approv[ing] the re-election of Rev. J.W. Seidel for two years from March, 1903" (Ex. 1).

      27.    Shearith Israel's archives in New York from 1912 contain a similar document stating:

> Application is hereby made to the Trustees of the Congregation Shearith Israel in the City of New York for its approval of the selection of Rev. Moses Eckstein, lately elected minister of Congregation Jeshuat Israel, worshipping in the Synagogue on Touro Street, Newport, R.I.  Agreeably to the terms of the lease of the said Synagogue by the Trustees of the Congregation Shearith Israel in the City of New York to the Congregation Jeshuat Israel of Newport, R.I. (Ex. 23)

      28.    As another example, in 1987 I approved the appointment of Rabbi Hyman Shapiro as Rabbi of the Touro Synagogue, and the Shearith Israel Board of Trustees then approved him as well (Ex. 24).

      29.    Shearith Israel's ownership and control from New York has been manifested in other ways as well.  During the 1800s, after the Touro Synagogue fell into disuse, for approximately 60 years after 1822, the Synagogue opened only occasionally, mainly for funerals.  The town of Newport expressed concern about the Synagogue and Cemetery falling into disrepair and requested Shearith Israel to help.  During this time, Shearith Israel exercised control over the real and personal property associated with the Touro Synagogue.  When there was a need to open the Synagogue or do repair work, permission was sought from Shearith Israel by Stephen Gould and later his widow and children.  Likewise, Shearith Israel sent its own ritual ministers to attend the occasional funerals or other services held in Newport.

      30.    More recently, in the 20th century, Shearith Israel was also involved in the efforts to restore the Touro Synagogue.

USActive 27095359.3

31.    Another manifestation of the supervision and control of Shearith Israel from New York over CJI is the fact that the CJI Constitution and By-laws contemplate that in addition to a President and Vice-President there will be "three Trustees elected by the Touro Congregation "and four Trustees appointed by the Spanish and Portuguese Congregation Shearith Israel, of New York City" (Ex. 18 Art. II).  The extensive discussion of Shearith Israel in the original CJI Constitution and Bylaws includes that the four Shearith Israel Trustees could vote in person or by proxy, that they did not have to live in Newport (unlike all other members of the Congregation), and that "no addition, alternation or amendment shall be made to this Constitution and By-laws that shall in any way add to, alter or affect the status of the four Trustees of the Spanish and Portuguese Congregation Shearith Israel of the City of New York" unless the Shearith Israel delegates voted unanimously to approve it (Art. XXI).  This governing instrument expressly says that the four Shearith Israel Trustees are deemed to be members of CJI (Art. XII) and also explicitly says:  "No real or other property owned . . . shall be sold or exchanged or mortgaged, unless by unanimous vote of the members present . . . ." (Art. XIX).  This provision too could not be changed absent unanimous approval of the Shearith Israel Trustees (Art. XXI).

32.    I am advised that somehow the current officers of CJI believe that this requirement no longer exists, but we have been given no idea why.  See Ex. 19.

33.    As a final example of Shearith Israel's control from New York of CJI and the Touro Synagogue, in 1959 the Smithsonian Institution wrote to the then Rabbi of the Touro Synagogue explaining that, while the Smithsonian had "a few pieces of Catholic silver used in the French fur trade, . . . as yet we have no pieces related to the Jewish religion in the United States" (Ex. 20).  The Smithsonian was interested in accessioning "a few significant items" (Ex. 20).  In contrast to what CJI did in 2012 in dealing with the Boston Museum of Fine Arts, in

-11-

1959 CJI (through its Rabbi) sent the request to Shearith Israel's Rabbi for its views (Ex. 21). From New York, Shearith Israel did not grant any consent (Ex. 22), and to the best of my knowledge based on our review of the relevant documents, no such sale ever took place.

**The "Ritual, Rites and Customs" of Shearith Israel in New York Govern Touro Synagogue**

34.     The governing Indenture provides that Shearith Israel not only holds the title to the Touro Synagogue and its appurtenances and paraphernalia, with CJI the lessee of the Synagogue building as well as of the variously described appurtenances, paraphernalia, or "etc.". The governing Indenture also makes plain that matters relating to the Touro Synagogue are to be conducted "in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews **as practiced and observed in the Synagogue of said Congregation Shearith Israel**" (Exs. 5, 6 (emphasis supplied).)

35.     This is the same language as is used in the three-way agreement between and among the United States, Shearith Israel, and CJI dating from 1945 and still in existence relating to the site of the Touro Synagogue being a National Historic Site (Ex. 9).  In that agreement CJI again acknowledged that "the title to the Touro Synagogue, Newport, Rhode Island, and its **appurtenances, . . . shall remain in the Shearith Israel Trustees**".  The agreement goes on to state that the Touro Synagogue would be preserved "as a place of public worship forever and for the maintenance of divine services in accordance with the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews **as practiced and observed in the Synagogue of said Congregation Shearith Israel**" (Ex. 9, Art. I(f) (emphasis supplied).)  Like the governing Indenture, the last act of signing the 1945 Agreement was done in New York.

36.     The "ritual, rites and customs" of Shearith Israel certainly include the fact that those to whom we loan ritual objects do not have any right to sell them.  I am not aware of

-12-

any sale of our ritual objects by Shearith Israel in the 358 year history of the Congregation. I am further of the view, having considered the question, that sale of the Rimonim in the unqualified manner apparently being proposed by CJI would be contrary to Jewish law and hence contrary to the ritual, rites and customs of the Orthodox Spanish and Portuguese Jews as practiced and observed by Congregation Shearith Israel.

**Sources of Proof Respose Exclusively or Predominantly in New York, Not Rhode Island**

37.     The above history implicates witnesses and documents to events occurring in centuries past; the course of dealing between the parties; and the ritual, rites, and customs of Congregation Shearith Israel. In each of those cases the sources of proof that I believe may bear on the topics exist exclusively or predominantly in New York, not Rhode Island. To be more specific:

38.     Even assuming Shearith Israel didn't own them before, the Rimonim were acquired by Shearith Israel in the period after 1822. It was at that time that the last Jewish resident of Newport at the time, Moses Lopez, left for New York. After 1822, the Synagogue, cemetery, and ritual items of Yeshuat Israel were left in the care of Stephen Gould, who took care of the property for several years. In 1826, Moses Lopez, then residing in New York, wrote to Stephen Gould that the "building is now considered owned at present by the Hebrew Society of this city" [i.e., Congregation Shearith Israel] and that he was "determined to send for the keys and place them in [the trustees] hands that they may do what they please with them" (Ex. 11 at 437). I am not aware of any descendants of either Mr. Lopez or Gould who are in Rhode Island. Documents would similarly be in New York.

39.     Similarly, during the 18th Century, the prominent members in the Newport Jewish community included those from families: Levy, Seixas, Machado, Hays, Hart,

-13-

and Pollack.  I am not aware of any descendants of these people who live in Rhode Island.  I do know that descendants and families of one or more of these people live in New York (for example, the Nathans and Hendricks are descendants or family of the Seixas; those I know of live in New York).  Documents would certainly be in New York.

        40.     In 1946, the Touro Synagogue was designated a National Historic site.  In the agreements reached between the United States Government, Shearith Israel, and CJI, Shearith Israel's ownership of the synagogue was reconfirmed, as set forth in Ex. 9.  The people involved in this transaction from Shearith Israel included:  Henry S. Hendricks (grandchildren have an association with Shearith Israel); Edgar J. Nathan, Jr. (grandfather of our current Parnas/President); Clarence E. Unterberg (son is a member of Shearith Israel); Harry Jacoby, Ephraim Berliner, A. Piza Mendes (daughter is a member of Shearith Israel); Jacob B. Fidanque, and Marcus A. Baumgart.  To the extent there are living descendants of these people who have any pertinent facts or memories, I do not believe any resides in Rhode Island; those I know of reside in New York.  And their documents, if any, would be in their families' possession (likely in New York), or in the possession of Shearith Israel, or, in the case of Mr. Hendricks, I believe in the archives the New York Historical Society in New York.

**Shearith Israel's Document Archives**

        41.     Shearith Israel has an extensive archive collection.  I believe Mr. Edinger, our current sexton, will be filing a declaration describing it.  The point I wish to emphasize is that the documents in the archive dating back to the 18th and 19th Centuries – and even many dating from the 20th Century – are frail and fragile and should not be moved.  They should be

-14-

reviewed and inspected by trained archivists or other professionals or persons in New York (for those documents in our Synagogue building) or New Jersey (for those in off-site storage).

**Documents and Witnesses Concerning Shearith Israel's Rites, Rituals, and Customs**

42.     As we saw above, CJI's own governing instruments, including the 1903 and 1908 Indentures and the 1945 Agreement with the federal government, all require that the practices at Touro Synagogue in Newport comply with the rites, rituals, and customs of Shearith Israel in New York.  That stipulation reflects the importance of New York to this dispute.  It is also the case that the people most knowledgeable of the rites, rituals, and customs all live in New York.  None to my knowledge lives in Rhode Island.

43.     More specifically, those persons with greatest knowledge of the rites, rituals, and customs relating to the importance to the Congregation, community, and the ritual service, as well as the care, use, and non-disposition of rimonim include:  myself; Rabbi Hayyim Angel; Rabbi Ira Rohde (currently one of our Cantors or Readers of Services); Phil Sherman (currently one of our Cantors or Readers of Services); Mr. Avery Neumark (a Shearith Israel Trustee and Head of the Board's Ritual Committee); and Zachary Edinger (our current Sexton); and other congregants of Shearith Israel.  All of these people live in New York.

44.     Any writings concerning Shearith Israel's rites, rituals, and customs in general, or the importance to the Congregation, community, and the ritual service, as well as the care, use, and non-disposition of rimonim would repose in at the Synagogue in New York or in the Congregation's archives.

**The Loss of the Rimonim to the Jews of America Will Be Felt Most Poignantly By the Jews of New York**

45.     Sale of the Rimonim in the manner I understand being proposed by CJI would be significantly (and negatively) felt by Orthodox and Sephardic Jewry in America. Recall that the Touro Synagogue is supposed to be run in accordance with the Orthodox Western Sephardic tradition, which is an authentically American tradition. To my knowledge there are very few if any Orthodox Jews of Western Sephardic heritage or custom in Rhode Island. The center for such Jews in the United States is New York. It is in New York where the significant issues raised by the sale for non-religious purposes of Jewish ritual objects would be most keenly felt. Similarly, it is in New York where the loss of the Touro Synagogue as an authentically American, Orthodox Synagogue practicing the Western Sephardic tradition will be felt.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Jerusalem, Israel on July 10, 2013

Rabbi Marc D. Angel